IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TACHANY EVANS                                                    PLAINTIFF

    v.                    Case. No. 2:08-CV-2110

WAL-MART STORES EAST, L.P.                                       DEFENDANT

### **MEMORANDUM OPINION**

Before the Court is Defendant Wal-Mart Stores East's Motion for Summary Judgment (Doc. 20). Evans' Complaint (Doc. 1) alleges race discrimination, gender discrimination, retaliation, and violations of the Americans with Disabilities Act (ADA). For the reasons reflected below, Wal-Mart's Motion (Doc. 20) is **GRANTED** and Evans' Complaint is **DISMISSED WITH PREJUDICE**.

**A. Standard of Review**

Summary Judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden of proof is on the moving party to set forth the basis of its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The Court must view all facts and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574 (1986). "The non-moving party, however, must still 'present evidence sufficiently supporting the disputed material facts that a reasonable jury could return a verdict in [her] favor.'" *Pope v. ESA Services, Inc.*, 406 F.3d

1001, 1003-04 (8th Cir. 2005). When a non-moving party has a complete failure of proof concerning an essential element of its case, that renders all other facts immaterial concerning that claim. *Celotex*, 477 U.S. at 322-23. However, summary judgment is rarely appropriate in employment-discrimination cases. *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994).

## B. Facts

The following facts are undisputed, except where noted.

On December 12, 2006, Plaintiff Tachany Evans accepted a position as an order-filler in Wal-Mart's distribution center in Clarksville, Arkansas. Her assigned hours were Saturday, Sunday, and Monday from 4:00 a.m. to 3:00 p.m. Evans began work on January 22, 2007. Lifting abilities are essential to the order-filler position, and order-fillers regularly lift up to 50 pounds, frequently lift up to 65 pounds, and occasionally lift up to 80 pounds. Evans' signature dated December 12, 2006 appears at the base of the job description, which sets out the lifting requirements.

On March 31, 2007, Evans injured her shoulder at work and was taken to the Clarksville hospital emergency room by Operations Manager Rick Kersey and hourly supervisor Cassie Wyatt. Evans left the hospital with her arm in a sling. On April 2, 2007, two days after her hospital visit, Evans complained to Human Resource Manager Jim Reeves that Kersey incorrectly told

the hospital nurse to fill out Evans' paperwork to reflect that Evans had no work restrictions as a result of her injury. Evans' account contradicts Kersey's, but for purposes of summary judgment, the Court accepts Evans' version that Kersey told the nurse to fill out the paper work to reflect that Evans had no lifting restrictions, when the examining doctor stated that Evans did have lifting restrictions.

With her injured shoulder, Evans was unable to lift enough to perform her normal job duties. In these situations, Wal-Mart allows temporarily injured employees to perform "temporary alternative duty" where they perform other tasks such as cleaning until they are able to resume their normal duties. Evans worked intermittently at her temporary alternative duty posts, taking opportunities to go home early, and taking other days as a leave of absence. Evans performed some of her temporary alternative duty in the central transportation office, but claims that the other employees did not talk to her and the work environment was hostile. Evans does not contend that her treatment in the central transportation office was because of discrimination.

On June 17, 2007, Evans received an evaluation given to all employees six months after beginning work. This evaluation was based on three criteria: safe work habits, quality, and productivity. All three criteria were scored on a scale of 1 to

5, with 1 being the worst score possible and 5 the best score. Evans received a 4 for safe work habits; 1 for quality; 1 for productivity; and an overall score of 2. The quality and productivity ratings are governed using strictly objective, computer generated numbers.

On July 5, 2007, Reeves informed Evans by letter that she had exceeded the ninety day limit on temporary alternative duty for her injury. The letter stated that she would remain on leave of absence until released by her treating physician, but that Wal-Mart would attempt to accommodate her if her restrictions were long-term. He also informed her of Wal-Mart's policy that limited her leave of absence to twelve months.

During the first few months after her shoulder injury, Evans' exact status is not clear. Evans believed she was on a forced leave of absence but that she had not chosen to take such leave. She further claims that she attempted to go to work but Wal-Mart would not let her work. The record reflects that Evans worked somewhat irregularly. In a form dated April 21, 2007, Evans appears to request a medical leave of absence to run from April 14, 2007 to July 13, 2007. Evans worked temporary alternative duty on April 1, 2, 7, 8, 9; May 5, 6, 7, 12, 13, 19, 20; June 2, 3; and July 7. It is not clear from the record when Evans was not permitted to work on temporary alternative duty. In her letters to Reeves, Evans stated her view that she

AO72A
(Rev. 8/82)

chose to end her leave in June, 2007 and she filled out no further leave of absence paperwork and she was ready to work again. However, her lifting restrictions were still in place, and there is no suggestion in the record that she could have order-filled without an accommodation.

After her injury, Evans refused other job offers from Wal-Mart and refused several invitations from Wal-Mart to fill out the paperwork for an accommodation for her lifting restrictions. Evans resisted all attempts to provide her with an accommodation for her restrictions. In a letter dated September 7, 2007, Evans refused any attempt to accommodate her lifting restrictions. The record also shows that Evans worked other jobs while on her leave of absence from Wal-Mart.

On April 10, 2008, Reeves offered Evans her previous job as an order-filler with the condition that she not use her right arm to lift more than 20 pounds. According to his deposition, Reeves wanted to see if Evans could do the job with her restrictions. During the day that she shadowed an order-filler, Evans questioned how she was supposed to lift eighty pounds with one arm. There is no indication that there was any formal evaluation of her ability to order-fill, but it appears that Evans was unable to order-fill with her lifting restriction. In a May 22, 2008 letter, Reeves informed Evans that her leave of absence would expire since she had not taken a position for

AO72A
(Rev. 8/82)

where Evans could perform the essential functions. Reeves' letter stated that she would have an additional thirty days to find a position she could perform, or face termination from Wal-Mart. Evans' response reflected her position that any job offers would have to be on the exact same schedule as her order-filling job, and at equal or better pay than what she was currently making. When she attempted to order-fill in April 2008, her wages were $14.80 an hour. The final offer that Evans rejected for scheduling and pay reasons differed from her order-filling position by thirty minutes and paid $15.05 per hour. Evans was terminated on July 1, 2008.

During her time at Wal-Mart, Evans made complaints that resulted in two internal investigations. The first investigation began on April 6, 2007 when Evans filed a multi-part complaint with Reeves. Evans' complaint included:

- allegations of safety violations,
- a report of damaged items being repackaged,
- allegations that Kersey had shared Evans' job performance information with other employees,
- other miscellaneous safety issues,
- a report that Evans' trainer said she was stubborn and mean and threatened to take her water away,
- that Evans was threatened with termination if she asked any more safety questions, and

**AO72A**
**(Rev. 8/82)**

- her allegations that Kersey had incorrectly told the nurse that she had no work restrictions.

In her complaint, Evans alleged that Kersey's statement to the nurse that she had no work restrictions was an act of discrimination. On April 7, 2007, Reeves began an investigation into Evans' complaint. Reeves sent Evans a letter dated April 21, 2007, reflecting the completion of the investigation. As a result of the investigation, Reeves recommended that Kersey be cautioned about involving himself in paperwork for injured workers. Reeves offered to allow Evans to work a different schedule to work under a different management team and avoid working under Kersey. Evans refused Reeves' offer.

Evans voiced disagreement with the conclusions of Reeves' investigation. In a letter dated May 2, 2007, Evans stated that Kersey had similarly mis-handled other employees' injuries and she expressed a desire to see the results of the investigation in greater detail. Evans' letter reflected a strong belief that Kersey owed her an apology. Finally, in the letter, Evans stated that she was ready to return to work as scheduled on May 5, 2007. There is no indication that Evans ever received an apology.

The other investigation began with a conversation that Evans had with Troy Cunningham, a supervisor at the central transportation office where Evans performed some of her

temporary alternative duty. Evans asked Cunningham what would happen to a supervisor that was sexually harassing employees or using racial slurs, and whether an apology would be ordered. The conversation was of concern to Cunningham, who sent an email to Reeves about the conversation. Reeves sent a letter to Evans and initiated another investigation. Reeves' investigation did not find any sexual harassment or use of racial slurs. Evans later acknowledged that the questions were hypothetical and that she had not been subjected to sexual harassment or racial slurs.

Evans filed two complaints with the Equal Employment Opportunity Commission relevant to this case. The first was filed on June 14, 2007. In that complaint, Evans claimed that Kersey's statement to the nurse that she had no work restrictions and the lack of any action taken against Kersey constituted acts of gender and race discrimination and ADA violations. The EEOC dismissed Evans' first complaint on July 16, 2008. Evans filed a second complaint with the EEOC on September 16, 2008. In that complaint, Evans alleged that her termination was retaliation for her EEOC charge of discrimination and also based on her race, gender, and disability. This charge was dismissed on September 19, 2008. Evans commenced the present suit on October 9, 2008.

**C. Discussion**

Evans brings this action under 42 U.S.C. § 1981, the

AO72A
(Rev. 8/82)

Arkansas Civil Rights Act, and Title VII for race discrimination, gender discrimination, and retaliation. She is also suing under the Americans with Disabilities Act. The legal standard for race and gender discrimination is the same for § 1981, Title VII, and the Arkansas Civil Rights Act. *See Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 550 (8th Cir. 2005).

**1. Race and Gender Discrimination**

The first way a plaintiff may establish unlawful employment discrimination is through direct evidence that shows a specific link between the discriminatory animus and the challenged decision. *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 863 (8th Cir. 2008). Alternatively, a plaintiff may survive summary judgment by creating an inference of discrimination through the burden shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Fields*, 520 F.3d at 863-64.

There are four elements to a *prima facie* case of discriminatory disparate treatment under the *McDonnell Douglas* framework: (1) membership in a protected class, (2) meeting her employer's legitimate job expectations, (3) suffering an adverse employment action, and (4) similarly situated employees outside the protected class were treated differently. *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007). "The employer must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the

adverse employment action." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc). "If the employer does this, the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual." *Id.* Not everything that makes an employee unhappy is an actionable adverse employment action; there must be a material employment disadvantage, such as a change in salary, benefits, or responsibilities. *LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir. 2001).

In this case, only the second two elements of the *prima facie* case are in contention. In its brief (Doc. 19), Wal-Mart concedes that Evans is a member of a protected class for both race and gender purposes and that her job was not in jeopardy before her termination. Evans' termination is undisputed as an adverse employment action. In addition to her termination, Evans contends she suffered two additional adverse employment actions. First is her treatment at the hospital when she suffered an on-the-job injury and second is her unfavorable evaluation which limited her ability to get a job transfer within Wal-Mart. Also at issue is the fourth element of the *prima facie* case, whether any similarly situated employees were treated differently.

### a. Kersey's Statements to the Nurse

The Court will first examine Kersey's statements towards the nurse and Wal-Mart's actions concerning Evans' injury.

To support her claim of race discrimination, Evans claims a white associate named Elaine or Alaine was treated differently, but Evans cannot remember the name of the person. Evans claims that "Elaine" rolled her ankle stepping off the floor jack, was placed on light duty, and returned to regular duty with no permanent restrictions. Even crediting Evans' account of "Elaine," "Elaine" is not similarly situated since "Elaine" had no permanent restrictions as did Evans. The main similarity is that in both "Elaine"'s case and Evans' case, is that Wal-Mart consistently followed its stated policy for dealing with injuries. "Elaine" was given light duty and then returned to work.

To support her claim of gender discrimination Evans contends that an associate named Rachael Dongallo had the same problems as she did with Kersey. The only evidence before the Court of Dongallo's mis-treatment is Evans' recollection of a conversation with her, which constitutes inadmissable hearsay. No affidavits, depositions, or other evidence of Dongallo's experience is before the Court. Evans did not witness Dongallo's alleged mistreatment and lacks personal knowledge of Dongallo's situation. Even if the Court were to credit Evans' account for summary judgment purposes, a *prima facie* case requires a showing of different treatment by someone outside of a protected class, not similar treatment by someone within the same class.

AO72A
(Rev. 8/82)

Evans puts forward no argument of how Kersey's statements to the nurse or Wal-Mart's actions concerning her injury are linked to Evans' race or gender, any employment disadvantage Evans suffered, or any admissible evidence of a similarly situated employee outside of the protected class that was treated differently. Evans has failed to establish a *prima facie* case regarding Kersey's statements to the nurse and Wal-Mart's actions concerning her injury.

### b. Evans' Evaluation

Evans contends that the negative employment evaluation she received constitutes an adverse action. Because Evans' evaluation scores were below a certain threshold, she was ineligible for a job transfer. However, no changes to any of Evans' working conditions, employment terms, duties, or compensation resulted from the negative evaluation. Therefore, ineligibility for a job transfer as a result of an unfavorable evaluation does not constitute an adverse action in this case.

Even assuming, *arguendo*, that Evans' negative evaluation constituted an adverse action, Wal-Mart meets its burden of articulating a legitimate, non-discriminatory reason for its actions, and Evans has shown no evidence of pretext. Evans' evaluation reflects that she received a score of 4 on a scale of 1 to 5 in the subjectively evaluated section of "safe work habits", and scores of 1 on the computer generated and

AO72A
(Rev. 8/82)

objectively evaluated sections of "quality" and "productivity." According to the uncontradicted deposition of Kersey, no human input is given on the quantitative portions of the quality and productivity evaluations; only the comments come from a human. Evans contends the numbers are unfair because she was still training, but she has produced no evidence that this number was, or could have been, manipulated by a person with a discriminatory motive. Evans has a complete failure of proof that the low evaluation scores were pretextual.

### c. Evans' Termination

The last example of an adverse action is Evans' termination, and a termination constitutes an adverse employment action. Wal-Mart's stated reason is that Evans exhausted her time for a leave of absence without returning to work. Evans contends that she was not on a leave of absence and that she was trying to return to work but was not permitted to return. However, Evans subjective belief is contrary to all the evidence before the Court. Evans could not perform the normal duties of an order-filler with her lifting restrictions. Evans was allowed some temporary alternative duty consistent with Wal-Mart's policy and was repeatedly offered accommodations and alternative jobs. The only inconsistencies with Wal-Mart's policy were favorable to Evans. Evans received more temporary alternative duty than the policy allows, and she received more leave of

absence time than normally allowed prior to termination. Even if the Court credits Evans' accounts of the experiences of "Elaine" and Rachael Dongallo, Evans has presented no evidence that Wal-Mart's actions were pretext for some form of race or gender discrimination. Evan's race and gender discrimination claims are therefore DISMISSED WITH PREJUDICE.

### 2. Retaliation

Indirect evidence of retaliation is also analyzed using the McDonnell Douglas burden shifting framework. *McLain v. Andersen Corp.*, 567 F.3d 956, 969 (8th Cir. 2009). A *prima facie* case of retaliation requires (1) engagement in a protected activity; (2) suffering an adverse employment action and (3) a causal connection. *Arraleh v. County of Ramsey*, 461 F.3d 967, 977 (8th Cir. 2006)."[T]emporal proximity alone is generally insufficient to prove pretext." *Id.* at 978. If the plaintiff demonstrates a *prima facie* case, the burden shifts to the defendant to articulate a legitimate reason for the action. *McLain*, 567 F.3d at 969. The burden then shifts back to the plaintiff to show evidence that the reason was pretextual. *Id.*

Evans asserts one instance of engagement in protected activities and two instances of adverse actions. Evans contends her EEOC charge on June 14, 2007 qualifies as a protected activity, and the first adverse employment action was her poor evaluation, which occurred on June 18, 2007. Evans also asserts

that her termination was an adverse employment action that was retaliatory. The temporal connection between Evans' first EEOC charge and her negative evaluation is enough to create an inference of causality for purposes of a *prima facie* case, but insufficient by itself to show pretext. No changes to Evans' working conditions, employment terms, duties, or compensation resulted from the negative evaluation. The only negative consequence is that Evans was ineligible for a job transfer. Therefore, the evaluation does not constitute an adverse action.

Even assuming, *arguendo*, that the job evaluation is an adverse action, Wal-Mart has met its burden of articulating a legitimate reason, and Evans has provided no evidence of pretext. The Court's analysis of Evans' evaluation for evidence of pretext is the same as for race and gender discrimination, *supra.* Evans has a complete failure of proof concerning pretext, and no reasonable fact-finder could find that Evans' negative review was retaliation for her EEOC complaint.

Evans also contends that her termination was a result of retaliation. Wal-Mart's reason for her termination was the exhaustion of her leave and refusal to accept another job or accommodate her lifting restriction. At the time Evans filed her first EEOC complaint, she was already on leave, so there can be no causal connection between her leave and her complaint for retaliation purposes. Evans' actual termination was over a year

AO72A
(Rev. 8/82)

after she filed the first EEOC charge. The essential facts of Evans' relationship to Wal-Mart did not change after her charge. Evans' lifting restriction left her unable to perform one of the essential functions of her job as an order-filler. The record reflects numerous attempts by Wal-Mart to offer her jobs or accommodate her lifting restrictions, all of which she declined. Given the length of time from the complaint to the termination, Wal-Mart's offers to accommodate her restrictions, the other job offers, the consistent expressions of Wal-Mart's policy, and Evans' failure of proof concerning pretext, no reasonable fact-finder could conclude that Evans' termination was a result of retaliation. Evans' retaliation claim is DISMISSED WITH PREJUDICE.

### 3. Americans with Disabilities Act

"Title I of the ADA prohibits discrimination by a covered employer 'against a qualified individual with a disability because of the disability.'" *Nuzum v. Ozark Automotive Distributors, Inc.*, 432 F.3d 839, 842 (8th Cir. 2005) (citing 42 U.S.C. § 12112(a)).

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate (1) her condition qualifies as a disability within the meaning of the ADA; (2) she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) she has suffered an adverse

**AO72A**
**(Rev. 8/82)**

employment action due to her disability. *Pittari v. American Eagle Airlines, Inc.*, 468 F.3d 1056, 1061 (8th Cir. 2006). The statute defines a disability as either "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such impairment", or "being regarded as having such an impairment." 42 U.S.C. § 12102(1).

The ADA was amended in 2008, and a threshold question is whether those amendments apply to Evans' case.[1] The amendments in question became effective January 1, 2009. Thus far, federal courts that have considered the retroactivity of the 2008 ADA amendments have determined that the relevant version of the ADA is the one in force at the time of the complained-of acts. *See Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936, 939-42 (D.C. Cir. 2009). This Court is unaware of any federal court that has held the amendments apply retroactively on damages cases.[2] This Court

---

[1] The effect of the amendments was to broaden the scope of protection under the ADA and to decrease the amount of limitation necessary to qualify as disabled under the Act. The bill also describes certain Supreme Court cases as inconsistent with Congressional intent.

[2] The Court is aware of five circuits that have indicated that the ADA amendments are not retroactive. *See Lytes*, 572 F.3d at 939-42; *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565-67 (6th Cir. 2009); *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009); *Kiesewetter v. Caterpillar Inc.*, 295 Fed. Appx. 850, 851 (7th Cir. 2008). *Fikes v. Wal-Mart Inc.*, 322 Fed Appx. 882, 883 (11th Cir. 2009). *See also Pastorius v.*

agrees with the other federal courts that the amendments are not retroactive. The amendments' effectiveness commenced several months after they were passed. Delaying the effectiveness of the amendments makes no sense if Congress's intention was merely to clarify existing law or correct what it viewed as erroneous interpretations of the existing ADA. Since all actions that are the subject of this case took place before 2009, the prior version of the ADA is the applicable law and the precedents abrogated by the 2008 amendments are still applicable to this case.

Evans' alleged disability is a 20 pound lifting restriction in one arm. Under relevant Eighth Circuit caselaw, a lifting restriction, by itself, is insufficient to establish disability. *Wenzel v. Missouri-American Water Co.*, 404 F.3d 1038, 1041 (8th Cir. 2005). Since Evans' shoulder injury does not qualify as a disability, she fails to establish a *prima facie* case of discrimination under the ADA. Evans' claim of discrimination under the ADA is DISMISSED WITH PREJUDICE.

**D. Conclusion**

Evans has failed to establish *prima facie* cases for race discrimination, gender discrimination, discrimination under the ADA, and retaliation. Accordingly, Defendant Wal-Mart's Motion

---

*Murphy Rigging & Erecting, Inc.*, No. 09-CV-0361, 2009 WL 2477759, 2009 U.S. Dist. LEXIS 70990 at *2-*3 (collecting cases).

AO72A
(Rev. 8/82)

for Summary Judgment (Doc. 20) is **GRANTED,** and all of Evans' claims are hereby **DISMISSED WITH PREJUDICE.**

IT IS SO ORDERED this 4th day of September, 2009.

/s/ Robert T. Dawson
Robert T. Dawson
United States District Judge

AO72A
(Rev. 8/82)